UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ALEX WILKINS                                                     CIVIL ACTION

VERSUS                                                           NO: 20-2728

MICHAEL LIBERTO, ET AL.                                          SECTION: "A" (4)

**ORDER AND REASONS**

The following motion is before the Court: **Motion for Summary Judgment (Rec. Doc. 39)** filed by Defendants, Michael Liberto, Matthew Severns, and Jonathon Cook. The plaintiff, Alex Wilkins, opposes the motion. The motion, submitted on June 8, 2022, is before the Court on the briefs without oral argument. For the following reasons, the motion is GRANTED IN PART AND DENIED IN PART.

I.     BACKGROUND

Alex Wilkins has brought this complaint pursuant to 42 U.S.C. § 1983 and state law arising out of an encounter with officers of the St. Tammany Parish Sheriff's Office. The incident occurred at the home of his parents, where Alex Wilkins (then thirty years old) was residing at the time. Alex Wilkins claims that the officers broke his jaw when they removed him from the home, which constituted excessive force.

On October 7, 2019, the deputy-defendants Michael Liberto, Matthew Severns, and Jonathon Cook were dispatched to the home of Shirley and Harvey Wilkins, in response to an Order of Protective Custody ("OPC"), for their son, Alex Wilkins (hereinafter "Plaintiff" or "Alex"). Plaintiff's mother, Ms. Shirley Wilkins, had applied to the Coroner's Office earlier that morning to obtain the OPC and in support of the OPC wrote the following narrative:

> Alex is trying to kill himself with drugs and drinking     he said he want [sic] to die by taking drugs it will allow him to end this sooner or later     he said he take ever [sic] kind of drugs he don't care what it is     go days no sleep

(Rec. Doc. 39-7, Request for Protective Custody).[1]

According to Ms. Wilkins, her son began having significant mental health issues and substance abuse problems following the death of a sibling in 2004.[2] (Rec. Doc. 39-8, Shirley Wilkins deposition at 17). Although Plaintiff had battled addiction and mental health issues for years, Ms. Wilkins applied for the OPC on the morning of October 7, 2019, because Plaintiff had been getting progressively worse, "wilding out on drugs" and had been found passed out (suspected as dead) in a friend's front yard the night before. (*Id.* at 22, 25). Ms. Wilkins called her husband, who was at home with Plaintiff, from the Coroner's Office to let him know what she had done (obtained the OPC) and to let him know that officers would be coming to get Alex. (*Id.* at 23). Mr. Wilkins told her that the officers were already at the house, that Alex was still sleeping, and that the officers were getting ready to wake him up. (*Id.* at 31-32). Ms. Wilkins was not present when the officers executed the OPC at the home so she has no first-hand personal knowledge regarding the events that occurred at the house.[3]

---

[1] The record also includes two OPCs that the Coroner authorized for Alex Wilkins in 2021 *after* the incident that forms the basis of this lawsuit. Those OPCs are not directly at issue in this case. These subsequent OPCs were raised at Mrs. Wilkins's deposition when she expressed the sentiment that she would not have gone to the Coroner had she known what was going to happen when the officers executed the OPC involved in this case. (Rec. Doc. 39-8, S. Wilkins deposition at 46). This assertion notwithstanding, Ms. Wilkins had sought at least two additional OPCs after the incident that forms the basis of this lawsuit.

[2] Significant may be too mild a term to describe both the mental health problems that Plaintiff has exhibited since the death of his sister (including bipolar disorder, schizophrenia, depression, paranoia, and hallucinations) and his substance abuse problem, which includes daily use of any and every kind of illegal drug that Plaintiff could obtain.

[3] Ms. Wilkins did speak to one of the officers on the telephone while the officers were at the house with Mr. Wilkins and Alex. It is not clear to whom she spoke but she was adamant

Mr. Wilkins was the only person at the home with Plaintiff when the officers arrived. (Rec. Doc. 39-9, Harvey Wilkins deposition at 14, 23). Two officers, Liberto and Severns, came into the home—Cook had not yet arrived on the scene. (*Id.* at 23-24); (Rec. Docs. 39-4, 39-5, & 39-6, Affidavits of Liberto, Severns, & Cook). Mr. Wilkins identified the officers simply as the tall one and the short one. (*Id.* at 29). While Plaintiff remained sleeping on the sofa, Liberto and Severns asked Mr. Wilkins if he thought that Plaintiff was going to try to run. (*Id.* at 24). Mr. Wilkins told them that he didn't know whether Alex would try to run away. (*Id.*). The talking woke Alex up and the officers put him in handcuffs. (*Id.* at 25). Mr. Wilkins assured Alex that "[i]t's nothing going on except your momma trying to save your life." (*Id.* at 28).

Continuing with Mr. Wilkins's version of events, at one point after he was handcuffed, Plaintiff told the officers something to the effect that he wasn't going anywhere. (*Id.* at 29). The officers began to walk him out toward the front of the house but according to Mr. Wilkins Plaintiff just stopped. It was at this point that Mr. Wilkins turned away because he was going to get Plaintiff's shoes and then everyone just disappeared without saying anything. (*Id.* at 31-32). When Mr. Wilkins stepped up to have a look he saw Plaintiff lying on the floor with his head and face against the door. The short officer had his hand pressing down on Plaintiff's face, and told him something to the effect of "okay, if I let you up, are you going to get up and walk out the door?" (*Id.* at 32). According to Mr. Wilkins, Plaintiff told the officer that they had just broken his jaw. (*Id.* at 33). But Mr. Wilkins was clear insofar as he did not see what led up to

---

that the deputy was rude, disrespectful, and nasty to her. (S. Wilkins deposition at 32, 33). The conversation between the officer and Ms. Wilkins pertained to whether Plaintiff would be brought to North Shore Hospital or Slidell Memorial.

Plaintiff being on the floor with his face against the door and he did not see the manner in which the officers brought Alex to the floor—the only thing that Mr. Wilkins saw was when Plaintiff stopped walking, after which Mr. Wilkins had turned away and completely missed seeing what happened next. (*Id.* at 35).

According to Plaintiff, he recalls waking on the sofa in the living room when one of the officers told him to stand up and put his hands behind his back. (Rec. Doc. 39-11, Alex Wilkins deposition at 89). He claims that he complied. When the officers asked Plaintiff if he wanted his shoes he told them no. (*Id.* at 90). It is Plaintiff's testimony that he and the officers started walking toward the front door but when Plaintiff got to the front door he said that he did not want to go. That's "when all hell broke loose," and someone picked Plaintiff up and slammed him on the head. Plaintiff ended up with two police officers on his back. (*Id.* at 97). Plaintiff expressly denies that he resisted or got loud or "cut up, none of that." (*Id.*). Rather, he simply said "I don't want to go," and the officers reaction was "they slammed [him] right in front the front door." (*Id.* at 98). According to Plaintiff, they slammed him down, they were on his back and he told them that he heard his jaw "pop." (*Id.* at 99). They didn't keep Plaintiff down long then they walked him out to the car. (*Id.* at 100).

Deputies Liberto and Severns have submitted affidavits that describe a different version of what happened at the Wilkins home, and those differences go to material issues in this case. According to the deputies, after they woke him, Plaintiff immediately began to scream that he was not going to go with them and that he did not need help. Plaintiff attempted to walk away so they handcuffed him after which he became calm. (Rec. Doc. 39-4 & 39-5, Liberto and Severns Affidavits ¶¶ 8). The deputies claim that at this point Plaintiff asked Deputy Liberto to take a look at the left side of his face and

inquired whether the hospital would take an X-ray of his jaw because it might be broken. (*Id.* ¶¶ 9). The deputies contend that this conversation about the possibility of a broken jaw occurred *before* any of the excessive force being alleged in this case occurred thereby confirming their contention that they had nothing to do with the injured jaw.

According to both deputies, Plaintiff then asked for a cigarette and when they told him that he could not have one, he became irate and began to scream again that he wasn't going to go.[4] (*Id.* ¶¶ 10). Deputy Liberto then began to walk Plaintiff out of the house when Plaintiff attempted to break away from the officer's grasp. (*Id.*). As they walked to the front of the residence Plaintiff continued to scream that he was not going to go and he attempted to use his body weight to resist from being escorted out of the house. (*Id.* ¶¶ 10). Deputy Severns then assumed the escort position on the left side in order to assist Deputy Liberto but Plaintiff continued to resist by swinging his legs, forcing the deputies to "escort" Plaintiff to the ground in an attempt to deescalate his behavior. (*Id.*). When Plaintiff became calm again they picked him up by the arms and escorted him to Liberto's patrol unit. While being escorted Plaintiff stated "clearly and with no issue" that the deputies had broken his jaw. (*Id.* ¶¶ 11).

Deputy Jonathon Cook, a deputy with the St. Tammany Parish Sheriff's Office Crisis Intervention Team, then arrived on the scene to take custody of Plaintiff and to transport him to the hospital. Plaintiff told Cook that he believed his jaw was broken. (Rec. Doc. 39-6, Cook Affidavit ¶ 7). After Plaintiff was admitted to the hospital, Cook

---

[4] The medical records indicate that Plaintiff is a smoker. Plaintiff does not dispute that he asked for a cigarette although he does not specifically recall asking for one. (A. Wilkins deposition at 100). Mr. Wilkins, however, seemed to recall that Alex had asked one of the officers for a cigarette. (H. Wilkins deposition at 46).

met with Plaintiff to discuss access to mental health resources in the community. Cook recalled that Plaintiff was eating food that did not appear to be soft without any issues and he was speaking clearly. (*Id.* ¶ 11).

Deputy Cook was never in the residence and was not present when Plaintiff claims to have been injured. Since Deputy Cook was not present when the officers executed the OPC inside the home, he has no first-hand personal knowledge regarding the events that occurred inside the house before he arrived. Also, since Deputy Cook was not present when Plaintiff claims to have been injured, the record would allow for no inference of liability on his part under any legal theory.

It is undisputed that Plaintiff underwent a surgical procedure to repair a fractured jaw shortly after the incident with Defendants, while he remained under care pursuant to the OPC.

The crux of the complaint, clarified through Plaintiff's deposition testimony, is that Officers Liberto and Severns broke his jaw when they slammed his head into the front door or its frame or the floor when they were removing Plaintiff from the house. Notwithstanding the panoply of legal citations included in the complaint, this is a Fourth Amendment excessive force claim under federal law with a related state law tort claim.[5]

Earlier this year the Court granted Defendants' motion to dismiss Plaintiff's claim for mental health damages based on Plaintiff's refusal to cooperate in completing an

---

[5] For some reason the complaint does not mention the Fourth Amendment but instead repeatedly invokes the inapplicable Eighth Amendment, as well as parts of Title 42 that are not implicated by the facts of this case. Plaintiff made no attempt to defend these claims in his opposition, or any of the several inapplicable state law citations included in his complaint.

independent psychological examination. (Rec. Doc. 38, Order). Plaintiff did not oppose that motion.

A jury trial is scheduled for July 25, 2022. (Rec. Doc. 24, Minute Entry 1/6/2022).

Defendants now move for summary judgment on all claims as explained below.

## II. DISCUSSION

Defendants motion for summary judgment is grounded on the assertion that they had no choice but to bring Plaintiff to the ground in response to his failure to adhere to lawful orders and due to his continued physical resistance. In other words, Defendants contend that their actions in bringing Plaintiff to the ground were justified, and that such a minor use of force was clearly not excessive or unreasonable and was warranted under the circumstances. Thus, Defendants contend that their use of force in removing Plaintiff did not violate the Fourth Amendment, or in the alternative, they are entitled to qualified immunity on this issue.

Defendants also argue that Plaintiff cannot establish causation for his injuries because he lacks expert medical causation evidence. Defendants argue that Plaintiff's state law claims fail for the same reasons that his federal excessive force claims fail so the Court should dismiss those too. But if the Court were to grant summary judgment as to the federal claims and deny summary judgment as to the state law claims, Defendants request that the Court decline to exercise supplemental jurisdiction.

### *Governing Standards*

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," when viewed in the light most favorable to the non-movant, "show that there is no genuine issue as to

any material fact." *TIG Ins. Co. v. Sedgwick James*, 276 F.3d 754, 759 (5th Cir. 2002) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* (*citing Anderson*, 477 U.S. at 248). The court must draw all justifiable inferences in favor of the non-moving party. *Id.* (*citing Anderson*, 477 U.S. at 255). Once the moving party has initially shown "that there is an absence of evidence to support the non-moving party's cause," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), the non-movant must come forward with "specific facts" showing a genuine factual issue for trial. *Id.* (*citing* Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986)). Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial. *Id.* (*citing SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993)).

When faced with a well-supported motion for summary judgment, Rule 56 places the burden on the non-movant to designate the specific facts in the record that create genuine issues precluding summary judgment. *Jones .v Sheehan, Young, & Culp, P.C.*, 82 F.3d 1334, 1338 (5th Cir. 1996). The district court has no duty to survey the entire record in search of evidence to support a non-movant's position.[6] *Id.* (citing *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1992); *Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir. 1988)).

---

[6] The Court pauses here to reject Defendants' contention that Plaintiff is relying on unverified pleadings as opposed to sworn evidence in order to defeat summary judgment. Sworn deposition testimony constitutes competent summary judgment evidence. Plaintiff's testimony regarding what occurred in the house is based on personal knowledge of the facts. Plaintiff's testimony is no more self-serving than the assertions that Defendants make in their affidavits, and this Court cannot determine credibility on summary judgment.

The right to make an arrest necessarily carries with it the right to use "some degree of physical coercion or threat" to effect it. *Buehler v. Dear*, 27 F. 4th 969, 980-81 (5th Cir. 2022) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). But the Fourth Amendment prohibits police from using more force than is reasonably necessary to effect an arrest. *Id.* (citing *Joseph v. Bartlett*, 981 F.3d 319, 332 (5th Cir. 2020)). A plaintiff arguing that a police officer has used excessive force in violation of the Fourth Amendment must show 1) injury, 2) which resulted directly and only from a use of force that was clearly excessive, and 3) the excessiveness of which was clearly unreasonable. *Id.* (citing *Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005)). The injury must be more than de minimis so as to constitute "some injury." *Id.* (citing *Freeman v. Gore*, 483 F.3d 404, 416 (5th Cir. 2007); *Alexander v. City of Round Rock*, 854 F.3d 298, 309 (5th Cir. 2017)).

But even if the plaintiff establishes that the police violated the Fourth Amendment, his claims against them cannot proceed unless he overcomes qualified immunity, which shields officials performing discretionary junctions "from liability for civil damages insofar as their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known." *Buehler,* 27 F.4th at 981 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The qualified immunity analysis in an excessive force case involves two distinct reasonableness inquiries: 1) whether the officer's use of force was objectively reasonable in light of Fourth Amendment standards, and 2) whether the right was clearly established such that a reasonable officer would know that the particular level of force used was excessive. *Id.* (citing *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015)). It is the plaintiff's burden to show that the unlawfulness of the defendant's conduct was

clearly established at the time it occurred. *Id.* Thus, the two prongs of the qualified immunity analysis, which may be addressed in any order, are whether the facts alleged make out a violation of a constitutional right, and if they do, whether the right at issue was "clearly established" at the time of the defendant's misconduct. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).

### *Analysis*

The Court begins with the element of injury as part of the § 1983 excessive force claim. It is beyond cavil that the injury claimed in this case—a broken jaw—is well beyond a de minimis injury. It is also undisputed that Plaintiff had a broken or fractured jaw after the October 7, 2019 incident because he had surgery to repair it, in close temporal proximity to the incident. The first point of contention to be addressed is whether the broken jaw resulted from the encounter with the officers or whether it pre-existed that encounter. If the broken jaw pre-existed the encounter, then all of Plaintiff's claims, whether based on state law or federal law, fail.[7]

Plaintiff's father was asked at his deposition whether Plaintiff had ever complained about his jaw prior to the October 7, 2019 incident. Mr. Wilkins said yes, that Plaintiff had been in a fight "probably four days or something before that." (H. Wilkins deposition at 36). Mr. Wilkins had not been present for the alleged fight and he wasn't sure how he had come to know about Alex getting hit on his jaw. (*Id.* at 36, 50). He had just heard rumors to that effect. (*Id.* at 52).

---

[7] It is clear under the controlling law that if the claimed jaw injury is not related to the use of the alleged excessive force then the "minor incidental injuries" such as transient pain and bruises that Plaintiff alleges as a result of being handcuffed do not rise to the level of injury sufficient to support a § 1983 claim. *See Buehler*, 27 F.4th at 982 (quoting *Freeman*, 483 F.3d at 417). Plaintiff has not argued otherwise in his opposition.

Plaintiff's mother denied that Plaintiff's jaw had been broken prior to the October 7, 2019 incident. (S. Wilkins deposition at 58). She also doubted that Alex had complained to her husband about the jaw prior to the incident with the officers. (*Id.* at 40).

Plaintiff was questioned at his deposition whether a few days before the October 7, 2019 incident he had gotten into a fight and been punched in the jaw. Plaintiff was adamant that no such fight had occurred and no blow to the jaw had occurred. (A. Wilkins deposition at 85). Plaintiff denied that he had told his father anything to the contrary. (*Id.*). Plaintiff did confirm, however, that he had been to the dentist to get a tooth pulled the day before the October 7, 2019 incident but his jaw did not hurt afterward and the dentist had said nothing about his jaw. (*Id.* at 85-87).

Of course, as noted above, both Deputies Liberto and Severns have stated in their affidavits that Plaintiff mentioned the possibility of a broken jaw *before* the alleged excessive force even occurred. (Liberto and Severns Affidavits ¶¶ 9).

Plaintiff's testimony and that of the contradicting assertions contained in Liberto's and Severns' affidavits create an issue of fact as to whether the jaw injury that necessitated the surgery occurred before or after the alleged excessive force occurred. The parties have not shown the Court any medical evidence from Plaintiff's dentist that would show one way or the other whether the jaw was injured at the time that the tooth was extracted the day before the incident.[8]

---

[8] X-ray evidence showing that the fracture was present on the day *before* the incident would be dispositive of this whole case. The same cannot be said of X-ray evidence showing no fracture the day before the incident because even if an X-ray was taken on the day before the October 7, 2019 incident and it showed no fracture, the possibility would remain that Plaintiff sustained the jaw injury in whatever "activities" led up to him being found (suspected as dead) on a friend's lawn the night before the officers came to the home to

In order to overcome the clear "he said/they said" contradiction in the evidence as presented by the only parties who have firsthand knowledge of what occurred, Defendants have retained a dentist to serve as their expert in this case, Craig J. Brandner, B.A., D.D.S. Dr. Brandner reviewed Plaintiff's dental records and medical records, and he evaluated Plaintiff in March of this year. Dr. Brandner opined that Plaintiff's jaw injury is inconsistent with contact with the ground. (Rec. Doc. 39-14, Brandner affidavit ¶ 12). Such an injury "requires pointed release of kinetic energy directly over the fracture site, such as a punch, foot to the face, or both." (*Id.*). Dr. Brandner therefore opines that Plaintiff's jaw fracture pre-existed the October 7, 2019 incident. (*Id.* ¶ 14). The doctor further states that "the radiograph from Lacombe Dental dated October 4, 2019 reveals a widened PDL mesial to tooth of #29 with a diastasis extending inferiorly through the mandibular body consistent with a fractured mandible." (*Id.* ¶ 13). Unfortunately, the doctor has chosen terms not to be understood by lay persons and has not explained the foregoing statement. If the doctor is trying to communicate that an X-ray from the dental visit that occurred the day before the incident occurred conclusively shows a fractured jaw, then the Court assumes that the doctor would have stressed this in his report and would not have relegated that "fact" to paragraph 13 of his affidavit.[9]

---

execute the OPC. Given that Plaintiff's father retrieved him from that lawn and brought him home to sleep it off, and given that Plaintiff had been sleeping continuously from that point until the officers were brought in to take him to the hospital, it is certainly possible that Plaintiff sustained the jaw injury at some point during the evening's "activities" and didn't even realize he had sustained an injury until the officers began talking to him. This scenario would of course be completely consistent with the officers' contentions.

[9] The Court points out that at trial an expert will not be allowed to testify beyond what is contained in the "four corners" of his report.

Given that Defendants' expert has opined that Plaintiff's jaw injury predated the October 7, 2019 incident, and given that the deadline to produce expert evidence has expired with Plaintiff having produced none, Defendants contend that notwithstanding the contradiction in Plaintiff's and the officers' testimony, Plaintiff cannot create an issue of fact as to his injury having been caused by the encounter with the officers. Defendants contend that expert medical causation testimony is a required part of Plaintiff's case and that without it he cannot meet his burden of proof as to causation.

The issue in this case is not whether or not the jaw was broken—it is undisputed that it was broken or at least fractured and that it was discovered to be so in very close temporal proximity to the incident. Plaintiff denies that the jaw was injured or even pained him before the incident. Plaintiff's contention is that the officers slammed his head down and he heard his jaw pop at that time. It is certainly within the understanding of lay persons of ordinary knowledge and experience, if they choose to credit Plaintiff's version of events, to draw a reasonable inference (without the benefit of expert testimony) that the jaw fracture that was identified in the immediate aftermath of that incident occurred during the encounter with the officers.[10]  Apparently, there is no medical evidence in the record that unequivocally refutes Plaintiff's contention that his jaw was *not* broken *before* the incident. Dr. Brandner has opined that the medical record supports his conclusion that the injury was pre-existing, and his opinion will

---

[10] The Court is not persuaded that the state court cases cited in Defendants' motion hold otherwise. For instance, *Giavotella v. Mitchell*, 289 So. 3d 1058, 1077 (La. App. 1st Cir. 2019), expressly notes that medical testimony is required in a tort action when a conclusion regarding medical causation is *not* one within the common knowledge. That case involved a plaintiff who had been in two auto accidents several months apart who was trying to link her injuries to one of the two accidents, and therefore medical causation testimony would be necessary to do that.

surely be persuasive, but the fact-finder may give whatever credit it chooses to Dr. Brandner's opinion.[11]

Based on the foregoing, there is a genuine issue of material fact as to whether the force used in the October 7, 2019 incident caused Plaintiff's injury. But the injury itself is not all that is in dispute because Defendants have made this case about the right to take Plaintiff to the floor—which the Court agrees is not in dispute and which in and of itself was not excessive to the need—while Plaintiff has testified that they slammed him on the head hard enough to break his jaw, a contention that Defendants have essentially ignored. Also, Defendants' and Plaintiff's (and Mr. Wilkins's) version of the amount of resistance that Plaintiff was exhibiting leading up to the incident on the floor, is also in dispute, and this fact is certainly material because it drives the level of force that's reasonable under the circumstances. Defendants were well within the law in using some force to take Plaintiff out of the house—that use of force, including taking him to the ground, is not in question and cannot be deemed excessive. But the Court is persuaded that if Plaintiff's testimony regarding the mild amount of resistance that he exhibited and the amount of force that was used, *i.e.*, slamming his head hard enough to fracture his jaw, is credited, then it is not so clear that the amount of force used was reasonable and not excessive. What is clear is that a reasonable officer would have known that using

---

[11] Defendants' characterization of Dr. Brandner as an "independent" witness is inaccurate. Dr. Brandner is a retained expert who charges significant expert fees, all of which go to bias and credibility when the fact-finder weighs the evidence.
　　The Court will add, however, that expert testimony would be required to recover for any of the longer term pain and dental issues that Plaintiff and his mother attributed to the October 7, 2019 incident in their depositions. Dr. Brandner noted that Plaintiff's dental health was essentially deplorable and that Plaintiff had already had 11 teeth pulled by the time that Dr. Brandner examined him. Thus, without expert testimony in this case, there can be no recovery for anything beyond the fractured jaw itself, certainly not for shifting teeth and some of the other issues Plaintiff and his mother described.

such force would be excessive and would violate the Fourth Amendment. Therefore, disputed issues of material fact preclude summary judgment on qualified immunity for the Fourth Amendment claim.[12]

Defendants moved for summary judgment on all causes of action asserted but Plaintiff made no attempt to defend any claims brought under the litany of statutes and Civil Code articles cited in the complaint. The motion for summary judgment will therefore be granted as to all claims except for the Fourth Amendment § 1983 claim, the § 1988 claim for attorney's fees, and the state law claim brought pursuant to Civil Code article 2315.[13]

Summary judgment will be granted in favor of Cook as to all claims. When claims are brought against multiple officers in connection with a single arrest each officer's conduct must be analyzed separately. *See Buehler*, 27 F.4th at 985 (citing *Darden v. City of Fort Worth*, 880 F.3d 722, 731 (5th Cir. 2018)). Officer Cook arrived after the incident that Plaintiff alleges injured him. There is no evidence whatsoever to establish fault against him.

Accordingly, and for the foregoing reasons;

**IT IS ORDERED** that the **Motion for Summary Judgment (Rec. Doc. 39)** filed by Defendants, Michael Liberto, Matthew Severns, and Jonathon Cook is **GRANTED IN PART AND DENIED IN PART** as explained above. The complaint is

---

[12] The Court also notes that while Defendants have gone to great lengths to make the Court aware of Plaintiffs' extensive criminal record, their affidavits make no mention whatsoever of what they knew about Plaintiff before they attempted to remove him from the home.

[13] The tort claim is viable because if the jury were to determine that the fractured jaw did result from the October 7, 2019 incident, the jury might nonetheless be persuaded that the injury resulted from mere negligence in the manner in which the takedown occurred as opposed to a constitutional violation.

dismissed in its entirety as to Jonathon Cook only.

June 27, 2022

_____
JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE